**KEYS YOUTH SERVICES, INC., Plaintiff,**

v.

**CITY OF OLATHE, KANSAS, Larry Campbell, John Bacon, Bill Trout, Michael Copeland, and Gary Mitchell, Defendants.**

**No. 98–2398–KHV.**

United States District Court, D. Kansas.

Feb. 23, 1999.

Jmaes H. Ensz, Sarah G. Madden, Ensz & Jester, P.C., Kansas City, MO, for Plaintiff.

Anthony F. Rupp, Andrew M. DeMarea, Shugart, Thomson & Kilroy, Overland Park, KS, for Defendants.

Roy T. Artman, Dept. of Health & Environment, Legal Services Div., Topeka, KS, for defendant Kansas Dept. of Health and Environment.

## *MEMORANDUM AND ORDER*

VRATIL, District Judge.

Keys Youth Services, Inc. [Keys], a not-for-profit corporation that operates youth homes in Kansas, alleges that zoning actions by the City of Olathe, Kansas and related defendants violated the Fair Housing Act [FHA], 42 U.S.C. §§ 3601 *et seq.*, as amended by the Fair Housing Amendments Act of 1988, and its constitutional rights to procedural and substantive due process and equal protection. This matter comes before the Court on the *Motion to Dismiss of Defendants Campbell, Bacon, Trout, and Copeland* (Doc. # 13) filed October 6, 1998, asserting that certain individual defendants—who are members of the Olathe City Council—are entitled to absolute or qualified immunity. For reasons stated below, the Court finds that defendants' motion should be sustained in part and overruled in part.

## Motion to Dismiss Standards

In ruling on a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the Court must assume as true all well pleaded facts in plaintiff's complaint and view them in a light most favorable to plaintiff. *Zinermon v. Burch,* 494 U.S. 113, 118, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). The Court must make all reasonable inferences in favor of plaintiff, and the pleadings must be construed liberally. *See* Fed.R.Civ.P. 8(a); *Lafoy v. HMO Colorado,* 988 F.2d 97, 98 (10th Cir.1993). The issue in reviewing the sufficiency of the complaint is not whether plaintiff will prevail, but whether plaintiff is entitled to offer evidence to support its claims.

The Court may not dismiss a cause of action for failure to state a claim unless it appears beyond a doubt that plaintiff can prove no set of facts in support of its theories of recovery that would entitle plaintiff to relief. *See Jacobs, Visconsi & Jacobs, Co. v. City of Lawrence,* 927 F.2d 1111, 1115 (10th Cir.1991). Although plaintiff need not precisely state each element of its claims, plaintiff must plead minimal factual allegations on those material elements that must be proved. *Hall v. Bellmon,* 935 F.2d 1106, 1110 (10th Cir. 1991).

## Factual Background

According to the complaint, the relevant facts are these:

Keys is a not-for profit corporation that operates six group homes in Johnson County, Kansas. The homes provide residential care for youths between the ages of 12 and 17 who have been abused, neglected, or abandoned by parents and/or guardians and who are under the supervision and direction of the Kansas Department of Social and Rehabilitation Services. In March 1998 Keys contracted to purchase a home in Olathe to house ten adolescent males and two or three adult staff members. The prospective residents have exhibited moderate behavioral, social, and

emotional problems and would receive psychological counseling and treatment while at the home. Keys would not accept residents who are threats to themselves or others. The home is located on over one acre of land in an area zoned for single family residences.

On March 13, 1998, Keys applied for a special use permit, as required by the City of Olathe zoning ordinance which classifies the home as a "residential care facility." On April 13, 1998, the City Planning Commission[1] held a public hearing to consider the application. The City staff recommended approval because the special use would provide a needed service for at-risk youth in the community and the proposed use was consistent with the City's Comprehensive Plan.[2] The Planning Commission, however, rejected the staff advice and did not recommend approval of the special use permit.

Kansas law, K.S.A. § 12–736, provides that "persons with a disability shall not be excluded from the benefits of single family residential surroundings by any municipal zoning ordinance."[3] It also provides that "[n]o municipality shall prohibit the location of a group home in any zone or area where single family dwellings are permitted" and declares unlawful any zoning ordinance, resolution or regulation which prohibits the location of a group home in such zone or area or which subjects group homes to regulations not applicable to other single family dwellings in the same zone or area. By its definition of what constitutes a "group home," however, Kansas law extends this protection only to dwellings occupied by eight or fewer persons with a disability.

On May 5, 1998, the City Council concluded that the Planning Commission

---

1.  The complaint refers to the Planning Commission and the Zoning Commission interchangeably. The Court refers to the Planning Commission throughout this Memorandum and Order.

2.  Plaintiff also avers that at the hearing sufficient, substantial evidence for the special use permit approval was presented, and further there was insufficient substantial evidence to justify denial of the permit. This a legal conclusion.

3.  The text of K.S.A. § 12–736 provides in relevant part as follows:

    Group homes, exclusion of, prohibited; conditions; definitions.

    (a) It is hereby declared to be the policy of the state of Kansas that persons with a disability shall not be excluded from the benefits of single family residential surroundings by any municipal zoning ordinance, resolution or regulation.

    (b) For the purpose of this act:

    (1) "Group home" means any dwelling occupied by not more than 10 persons, including eight or fewer persons with a disability who need not be related by blood or marriage and not to exceed two staff residents who need not be related by blood or marriage to each other or to the residents of the home, which dwelling is licensed by a regulatory agency of this state;

    (2) "municipality" means any township, city or county located in Kansas;

    (3) "disability" means, with respect to a person:

    (A) A physical or mental impairment which substantially limits one or more of such person's major life activities;

    (B) a record of having such an impairment; or

    (C) being regarded as having such an impairment. Such term does not include current, illegal use of or addiction to a controlled substance, as defined in section 102 of the controlled substance act (§ 21 U.S.C. 802);

    . . .

    (e) No municipality shall prohibit the location of a group home in any zone or area where single family dwellings are permitted. Any zoning ordinance, resolution or regulation which prohibits the location of a group home in such zone or area or which subjects group homes to regulations not applicable to other single family dwellings in the same zone or area is invalid. Notwithstanding the provisions of this act, group homes shall be subject to all other regulations applicable to other property and buildings located in the zone or area that are imposed by any municipality through zoning ordinance, resolution or regulation, its building regulatory codes, subdivision regulations or other nondiscriminatory regulations.

**918**

findings were flawed and that there was a substantial issue whether they were legally justifiable under state and federal law. The City Council therefore voted to remand the matter to the Planning Commission so that the City attorney "might analyze law and craft findings that would authorize the City Council and Mayor to effectively deny [p]laintiff's application for the special use permit." *Complaint* ¶ 14.

Before the City Council voted to return the application to the Planning Commission, Keys had informed the City, individual members of the City Council, and the Mayor that state and federal law required the City to issue the special use permit. Keys also advised that failure to do so would subject the City and the individual defendants to liability for actual damages and attorney's fees, and also subject the individual defendants to liability for punitive damages.

Shortly after May 15, 1998, the City informed Keys that it would hold another full hearing before the Planning Commission. Keys then sent a letter to the City and the individual defendants, asserting that it was entitled to immediate approval of the special use permit and that failure to issue the permit would subject it to damages. The City and the individual defendants then obtained a legal opinion from outside legal counsel. That opinion concluded that the City had an obligation under the FHA and state law and that it should "reasonably accommodate Keys by allowing a 10–resident group home in a single family zone, even though this [was] over the statutory limit defining group homes." *Complaint* ¶ 17.

The City, through its attorney, then crafted unsubstantiated findings of fact to support a denial of Keys' application for a special use permit. The City submitted these findings to the Planning Commission, which on June 21, 1998, recommended that Keys' application be denied.

Keys informed the City and the individual defendants that the Planning Commission's recommendation was untenable and

asked that the City Council and Mayor meet in executive session to recognize plaintiff's "unqualified right to use its home as a group home." *Complaint* ¶ 19. On July 7, 1998, however, the City denied Keys' application for a special use permit, based on the votes of the individual defendants.

Keys is now unable to operate the home because Gary R. Mitchell, Secretary for the Kansas Department of Health and Environment, will not issue a license or authorize referrals until the home receives local zoning approval. Keys asserts that efforts to pursue a remedy through the state appeal process "will predictably be fruitless," *Complaint* ¶ 21, and that it has incurred actual damages for costs of the home and lost profits.

In Count II, Keys asserts that the FHA required defendants to use the special use permit as a reasonable accommodation for the potential handicapped (mentally impaired) residents. Keys asserts that in denying the permit, defendants discriminated against the potential residents (and thus Keys) because of the "familial status" of the residents. *Complaint* ¶ 25 Keys asserts that if the ten young men and two or three supervising adults had been related by blood, they would have been absolutely entitled to occupy the house without a special use permit under the City Zoning Code. Based on this position, Keys asserts that K.S.A. § 12–736 authorizes ten persons to occupy a group home in a single family residential setting, notwithstanding local zoning to the contrary.

Keys asserts that as a result of the City's actions it has suffered irreparable harm for which it has no adequate remedy in law. Keys asks the Court to declare that it is entitled to occupy and use its home as a group home for ten young men with appropriate adult supervision, to find that Keys is in compliance with local zoning laws, and to direct Mitchell to find that local zoning approval exists in deciding whether to issue a license for a group

home. Keys also asks the Court to award actual and punitive damages.

In Count III Keys asserts that defendants violated its federal rights under the Fourteenth Amendment to equal protection, substantive due process, and the right to be free from a taking without due process of law, as well as under the FHA. Keys thus asserts a cause of action under 42 U.S.C. § 1983. Keys asserts that it is entitled to actual damages from the City and individual defendants, to punitive damages from individual defendants, and to reasonable attorney fees as well as the declaratory relief sought in Count II.

In Count IV, Keys asserts that defendants have violated K.S.A. § 12–736 and asks the Court to declare that it is entitled to occupy and use its home as a group home, to direct Mitchell to consider that local zoning approval exists in determining whether to issue Keys a license for a group home, and to assess costs incurred in this action.

As an alternative, Count V asserts that as a matter of law the City lacked sufficient substantial evidence to deny Keys' application for a special use permit. Keys asks the Court to declare that Keys is entitled to the special use permit and order the City to issue the permit. Keys also asks the Court to direct Mitchell to consider that local zoning approval exists in determining whether to issue Keys a license for its group home, and to assess the costs of this action.

### ANALYSIS

The individual defendants assert that they are entitled to absolute legislative immunity or, in the alternative, qualified immunity.

### I. *Absolute Legislative Immunity*

■ Defendants argue that they are entitled to absolute legislative immunity because plaintiff sues them solely for exercising their rights and responsibilities as elected legislators. The principle of legislative immunity for legislators has been long established. *See Tenney v. Brandhove,* 341 U.S. 367, 372, 71 S.Ct. 783, 95 L.Ed. 1019 (1951) (state legislators); *Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency,* 440 U.S. 391, 405, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979) (regional legislators). In *Bogan v. Scott–Harris,* 523 U.S. 44, 118 S.Ct. 966, 970, 140 L.Ed.2d 79 (1998), the Supreme Court recently held that local legislators are absolutely immune from suit under § 1983 for their legislative activities. Legislative immunity only accrues, however, when legislators are acting in the sphere of legislative activity. *Kamplain v. Curry County Bd. of Comm'rs,* 159 F.3d 1248, 1251 (10th Cir. 1998). "In order to determine whether Defendants should be cloaked in legislative immunity, we look to the function that the [Defendants] were performing when the actions at issue took place." *Id.* "[T]he Supreme Court has instructed us, in admittedly differing contexts, that, at its core, the legislative function involves determining, formulating, and making policy." *Id.*

In *Bogan,* the Supreme Court found that defendant's acts in voting for an ordinance were "in form, quintessentially legislative," 118 S.Ct. at 973, and therefore entitled to legislative immunity. Defendants insist that this language from *Bogan* is controlling in this case. But the Supreme Court in *Bogan* went on to state as follows:

We need not determine whether the formally legislative character of petitioners' actions is alone sufficient to entitle petitioners to legislative immunity, because here the ordinance, in substance, bore all the hallmarks of traditional legislation. The ordinance reflected a discretionary, policymaking decision implicating the budgetary priorities of the city and the services the city provides to its constituents. Moreover, it involved the termination of a position, which, unlike the hiring or firing of a particular employee, may have prospective implications that reach well beyond the particular occupant of the of-

fice..... [And the matter concerned] a field where legislators traditionally have power to act. Thus, petitioners' activities were undoubtedly legislative.

118 S.Ct. at 973 (internal citations and quotations omitted).

"The question of whether a governing body's actions are legislative, administrative, or quasi-judicial is an issue of state law." *Fry v. Board of County Commr's of Baca,* 837 F.Supp. 330, 334 (D.Colo.1991). In Kansas,

A city, in enacting a general zoning ordinance, or a planning commission, in exercising its primary and principal function under K.S.A. 12–704 in adopting and in annually reviewing a comprehensive plan for development of a city, is exercising strictly legislative functions. When, however, the focus shifts from the entire city to one specific tract of land for which a zoning change is urged, the function becomes more quasi-judicial than legislative. While policy is involved, such a proceeding requires a weighing of the evidence, a balancing of the equities, an application of rules, regulations and ordinances to facts, and a resolution of specific issues.

■ *Golden v. City of Overland Park,* 584 P.2d 130, 135, 224 Kan. 591, 597 (1978). Based on Kansas law, the Court finds that the zoning decision in this case—whether to grant a conditional use permit—was a quasi-judicial or administrative act rather than a legislative act. Thus defendants are not entitled to absolute legislative immunity for their decision to deny Keys' application for a special use permit.

II. *Qualified Immunity*

■ In the alternative, the individual defendants claim that they are entitled to qualified immunity. "Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity provides government officials immunity from suit as well as from liability for their discretionary acts. *See Mitchell v. Forsyth,* 472 U.S. 511, 526–27, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *Pueblo Neighborhood Health Ctrs. v. Losavio,* 847 F.2d 642, 644 (10th Cir.1988); *see also Antoine v. Byers & Anderson, Inc.,* 508 U.S. 429, 113 S.Ct. 2167, 124 L.Ed.2d 391 (1993). The doctrine of qualified immunity serves the goals of "protecting officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Butz v. Economou,* 438 U.S. 478, 506, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978).

"Where a qualified immunity defense is asserted in a 12(b)(6) motion ... we apply a heightened pleading standard, requiring the complaint to contain 'specific, non-conclusory allegations of fact sufficient to allow the district court to determine that those facts, if proved, demonstrate that the actions taken were not objectively reasonable in light of clearly established law.' " *Dill v. City of Edmond Okla.,* 155 F.3d 1193, 1204 (10th Cir.1998) (quoting *Breidenbach v. Bolish,* 126 F.3d 1288, 1293 (10th Cir.1997)).[4] After the qualified immunity

---

**4.** Relying on *Leatherman v. Tarrant County,* 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993), plaintiff asserts that the complaint cannot be subjected to a "heightened pleading requirement." *See Sapp v. Cunningham,* 847 F.Supp. 893, 900 n. 9 (D.Wyo.1994) (stating that *Leatherman* "effectively overrules this aspect of *Sawyer v. County of Creek,* 908 F.2d 663, 665–67 (10th Cir.1990), where the Tenth Circuit endorsed a heightened pleading re-

quirement."). *Leatherman,* however, specifically did not address whether "its qualified immunity jurisprudence would require a heightened pleading in cases involving individual government officials." 507 U.S. at 168, 113 S.Ct. 1160. Some have argued that in *Crawford–El v. Britton,* 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998), the Supreme Court indicated that it would not require a heightened pleading standard in such

defense is raised, "[p]laintiff may amend [the] complaint to include additional 'specific, non-conclusory allegations of fact' sufficient to allow the district court to determine whether Defendants are entitled to qualified immunity." 155 F.3d at 1204 (quoting *Breidenbach* at 1293).

In response to defendants' motion to dismiss in this case, Keys has not amended its complaint nor sought leave to do so.[5] Should plaintiff desire to amend the complaint, the Court will consider a motion to do so made within ten days of the filing of this order.

In order to defeat defendants' claim of qualified immunity, plaintiff must "come forward with facts or allegations sufficient to show both that the defendant's alleged conduct violated the law and that that law was clearly established when the alleged violation occurred." *Pueblo Neighborhood Health Ctrs., Inc. v. Losavio,* 847 F.2d 642, 646 (10th Cir.1988); *see also Dixon v. Richer,* 922 F.2d 1456, 1460 (10th Cir. 1991). If plaintiff meets this burden, the normal burden in resisting a motion to dismiss shifts back to defendants. *See* 847 F.2d at 646.

Ordinarily, in order for a plaintiff to demonstrate that a law is clearly established, "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Medina v. City and County of Denver,* 960 F.2d 1493, 1498 (10th Cir.1992); *see also Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (a right is

clearly established if the contours of the right are "sufficiently clear [so] that a reasonable official would understand that what he is doing violates that right."). A plaintiff "must do more than identify in the abstract a clearly established right and allege that the defendant has violated it." *Pueblo Neighborhood Health Centers v. Losavio,* 847 F.2d 642, 645 (10th Cir.1988). A plaintiff "must articulate the clearly established constitutional right and the defendant's conduct which violated the right with specificity." *Albright v. Rodriguez,* 51 F.3d 1531, 1535 (10th Cir.1995) (quotation omitted); *see also Walter,* 33 F.3d at 1242 ("the plaintiff ... has the burden to show with particularity facts and law establishing the inference that the defendants violated a constitutional right."). "If the district court denies the defendant qualified immunity, the court should identify on the record the defendant's conduct that violated clearly established law." *Mick v. Brewer,* 76 F.3d 1127, 1134 (10th Cir. 1996) (citing *Albright,* 51 F.3d at 1535). *Tonkovich v. Kansas Bd. of Regents,* 159 F.3d 504, 516–17 (10th Cir.1998).

"[T]he Supreme Court has recently stated that the better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all. Normally, it is only then that a court should ask whether the right allegedly implicated was clearly established at the time of the events in question." *Id.* (citing *County of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 1714 n. 5, 140 L.Ed.2d 1043 (1998)); see also *Siegert v. Gilley,* 500 U.S.

---

a case. *See Judge v. City of Lowell,* 160 F.3d 67 (1st Cir.1998). But the actual holding of *Crawford–El* was that in an individual capacity suit against a government official, in which the official's improper motive is a necessary element, a plaintiff need not adduce "clear and convincing evidence" of the motive to defeat a summary judgment motion.

The Tenth Circuit has continued to apply a heightened standard of pleading, even after *Crawford–El.* This Court is therefore compelled to do likewise in this case.

**5.** Keys did attach documents to its memorandum in opposition to defendants' motion to dismiss. The Court has not considered matters outside the pleadings in ruling on this motion, however, and it declines to convert the motion to one for summary judgement. *See Lowe v. Town of Fairland, Okla.,* 143 F.3d 1378, 1381 (10th Cir.1998) ("[C]ourts have broad discretion in determining whether or not to accept materials beyond the pleadings.").

226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). Thus, the Court follows the two-step test to analyze the issue of qualified immunity.

The federal rights involved in this case are plaintiff's rights under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.,* as amended by the Fair Housing Amendments Act of 1988, and its constitutional rights to equal protection and substantive due process and freedom from taking of property without due process of law.

## A. *Fair Housing Act*

The Court first addresses plaintiff's FHA claim. The FHA provides in relevant part that it is unlawful

(1) To discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—

(A) that buyer or renter;

(B) a person residing or intending to reside in that dwelling after it is sold or rented, or made available; or

(C) any person associated with that buyer or renter.

(2) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling ... because of a handicap of [any person listed in (A) through (C) above].

42 U.S.C. § 3604(f)(1) and (2). The FHA defines discrimination to include "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

The FHA defines "handicap" as follows:

(h) "Handicap" means, with respect to a person—

(1) a physical or mental impairment which substantially limits one or more of such person's major life activities,

(2) a record of having such an impairment, or

(3) being regarded as having such an impairment ...

42 U.S.C. § 3602.

The FHA also prohibits discriminatory housing practice based on "familial status." The FHA, specifically, 42 U.S.C. § 3602(k) defines "familial status" as follows:

(k) "Familial status" means one or more individuals (who have not attained the age of 18 years) being domiciled with—

(1) a parent or another person having legal custody of such individual or individuals; or

(2) the designee of such parent or other person having such custody, with the written permission of such parent or other person.

The protection afforded discrimination on the basis of "familial status" shall not apply to any person who is pregnant or is in the process of securing legal custody of any individual who has not attained the age of 18 years.

The FHA also includes a provision that entirely exempts from the FHA's reach "any reasonable local, State, or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling." 42 U.S.C. § 3607(b)(1). In *City of Edmonds v. Oxford House, Inc.,* 514 U.S. 725, 730, 115 S.Ct. 1776, 131 L.Ed.2d 801 (1995), the Supreme Court held that this provision only exempts total occupancy limits which are intended to prevent over-crowding, and not ordinances which are designed to promote the "family character" of a neighborhood. *See id.* at 733, 115 S.Ct. 1776 (maximum occupancy restrictions "cap the number of occupants per dwelling, typically in relation to available floor space or the number and type of rooms").

Although the complaint does not point to specific provisions of the FHA, it clearly

alleges that defendants violated the Act by making plaintiff's home unavailable to handicapped people on the basis of handicap [§ 3604(f)(1) ] and familial status [§ 3602(k) ]. Defendants assert that the complaint does not allege that potential residents of the home are handicapped. But the complaint does state that potential residents will be "mentally disabled." Under the FHA, a mentally disabled person is considered handicapped and thus entitled to reasonable accommodation. Whether potential residents are ultimately found to be "handicapped" is not before the Court on this motion. *Cf. Sunderland Family Treatment Servs. v. City of Pasco,* 127 Wash.2d 782, 903 P.2d 986 (1995) ("abused and neglected children" not shown to be handicapped based on record before court); *Act I, Inc., v. Zoning Hearing Bd. of Bushkill Township,* 704 A.2d 732 (Pa.1997) (youths who were victims of abuse and removed from their homes did not fit definition of handicapped).

Plaintiff alleges that residents will have been found not to be threats to themselves or others, and that the City staff recommended approval of the special use permit because plaintiff would provide a valuable service and needed program, and the proposed use was consistent with the City's land use plan. Plaintiff also alleges that for financial reasons, it cannot feasibly operate a group home for fewer than ten youth. The individual defendants voted not to issue a special use permit. Taking these facts as true, the threshold question is whether the City's refusal to let the home operate with ten residents could be a failure to provide reasonable accommodation under the FHA.

Although not directly on point, the Tenth Circuit's opinion in *Bangerter v. Orem City Corp.,* 46 F.3d 1491 (10th Cir. 1995) provides guidance. In *Bangerter,* a resident of a group home for the mentally handicapped claimed that the City of Orem discriminated against him under the Fair Housing Act. Specifically, he asserted that the City had acted unlawfully when—as a condition to a conditional use permit—it imposed a requirement that the group home provide 24–hour supervision and a community advisory committee. The City allowed various uses in its R–1–8 single family residential neighborhoods, including foster care homes, rectories, and group homes for the elderly. State law outlined special conditions that municipalities could impose on permits for group homes for the handicapped; these condition apparently could not be imposed, however, on other multiple uses.

Plaintiff in *Bangerter* alleged that the City had violated the FHA by intentionally discriminating against him as a handicapped person, taking actions that produced discriminatory effects against him, and failing to provide reasonable accommodations in its zoning policies. 46 F.3d at 1499. The district court found that plaintiff had not alleged that the City acted with discriminatory motive and that he therefore could not state a claim for discriminatory intent. It found that plaintiff had alleged a prima facie case of discriminatory treatment, however, because the city ordinance on its face treated handicapped individuals differently from non-handicapped persons. 46 F.3d at 1496. The district court finally concluded that the challenged ordinance and the 24–hour supervision requirement were rationally related to the legitimate government interests of integrating handicapped persons into "normal surroundings." 46 F.3d at 1497 (citing *Bangerter v. Orem City Corp.,* 797 F.Supp. 918, 921 (D.Utah 1992)).

The Tenth Circuit reversed, noting that the rational relationship finding requires a balancing analysis which involved evidence not yet presented by the City. Thus the district court had clearly gone beyond the pleadings in granting the motion to dismiss. Perhaps more importantly, the Tenth Circuit held that the district court had used the wrong legal standard in applying the FHA. The state statute and the city ordinance facially singled out the handicapped, and thus plaintiff had made

out a prima facie case of intentional discrimination. Because the claim was for disparate treatment, the ultimate question was whether defendant had intentionally discriminated against plaintiff. The Tenth Circuit required plaintiff to show, on remand, that the City subjected his group home to conditions not imposed on other group homes in single family zoned areas. If plaintiff did so, the district court would have to address the City's justifications for discriminatory treatment, to determine if they survived scrutiny under more than a rational basis test. The Tenth Circuit stated that "restrictions that are narrowly tailored to the particular individuals affected could be acceptable under the FHA if the benefit to the handicapped in their housing opportunities clearly outweigh[s] whatever burden may result to them." 46 F.3d at 1504.

In *Bangerter*, the Tenth Circuit also concluded that plaintiff had not stated a valid claim that the City failed to make reasonable accommodation for the handicapped in its zoning policies. "[t]he thrust of a reasonable accommodation claim is that a defendant must make an affirmative change in an otherwise valid law or policy. By one court's definition, a 'reasonable accommodation' involves 'changing some rule that is generally applicable so as to make its burden less onerous on the handicapped individual.'" 46 F.3d at 1501 (quoting *Oxford House, Inc. v. Township of Cherry Hill*, 799 F.Supp. 450, 462 n. 25 (D.N.J.1992)). Plaintiff in *Bangerter* did not challenge an ordinance that was generally applicable, and a reasonable accommodation claim was therefore inappropriate. In contrast, in the instant case, Keys challenges defendants' failure to change an ordinance that is generally applicable. A reasonable accommodation claim appears to be appropriate.

Based on the facts alleged in the complaint, plaintiff arguably has alleged a violation of the FHA. *See United States v. City of Taylor*, 872 F.Supp. 423 (E.D.Mich. 1995), *aff'd in part, rev'd in part*, 102 F.3d

781 (6th Cir.1996) (where adult foster care home sought twelve residents and permit was required for more than six, failure to approve home in single family zone was failure to make reasonable accommodation; based on need and economical viability, however, nine rather than twelve was reasonable accommodation as to number of residents); *Parish of Jefferson v. Allied Health Care, Inc.*, 1992 WL 142574 (E.D.La.1992) (refusal to grant variances to group home to operate with six rather than four residents was failure to accommodate in violation of 42 U.S.C. § 3604(f)); *Children's Alliance v. City of Bellevue*, 950 F.Supp. 1491 (W.D.Wash.1997) (restriction on group homes violated FHA on its face, in part because it restricted number of residents in group facilities but not in homes of related persons). *But see Oxford House, Inc. v. City of Virginia Beach, Va.*, 825 F.Supp. 1251 (E.D.Va.1993) (suggesting in dicta that even if limiting the occupancy of group homes made the homes economically unfeasible, such fact was probably not sufficient to establish FHA discrimination).

The question before us, however, is whether defendants' actions in denying the special use permit violated clearly established law. As noted above, the Tenth Circuit has held that a law is clearly established only if there is a "Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff' maintains." *Medina v. City and County of Denver*, 960 F.2d 1493, 1498 (10th Cir.1992). No Supreme Court decision is directly on point here. Further, although the Tenth Circuit opinion in *Bangerter* has informed this Court's decision whether plaintiff's complaint sets forth a factual claim under the FHA, *Bangerter* did not clearly alert a reasonable city councilman that he would violate the Fair Housing Act if he voted against a special use permit for a group home that would house two more persons than required by state law. *See* K.S.A. § 12–736;

*Bangerter*, 46 F.3d at 1502 (dismissing plaintiff's reasonable accommodation claim because he challenged statute aimed at "group homes for the handicapped" and was not seeking reasonable accommodation under generally applicable law or regulation).

The weight of clearly established case law from other jurisdictions is not as plaintiff would have it. For example, although the Sixth Circuit has held that the FHA required a city to allow nine residents rather than the statutory limit of six, it also held that the city was not required to accommodate twelve. *See United States v. City of Taylor*, 872 F.Supp. 423 (E.D.Mich. 1995), *aff'd in part, rev'd in part*, 102 F.3d 781 (6th Cir.1996) (where adult foster care home sought twelve residents and permit was required for more than six, failure to approve home in single family zone was failure to make reasonable accommodation; based on need and economic viability, however, nine rather than twelve residents was reasonable accommodation.) As noted above, other cases which have addressed occupancy limits for group homes have reached varying results. *Compare Parish of Jefferson v. Allied Health Care, Inc.*, 1992 WL 142574 (E.D.La.1992) (city's refusal to grant group home variance for six rather than four residents constituted failure to accommodate in violation of 42 U.S.C. § 3604(f)); *Children's Alliance v. City of Bellevue*, 950 F.Supp. 1491 (W.D.Wash.1997) (restriction on group homes violated FHA on its face, in part because it restricted number of residents in group facilities but not in homes of related persons); *with Oxford House, Inc.*

*v. City of Virginia Beach, Va.*, 825 F.Supp. 1251 (E.D.Va.1993) (suggesting in dicta that even if occupancy limit on group home for recovering substance abusers rendered such homes economically unfeasible, such fact not likely by itself to establish FHA discrimination).

■ The Court must find that the individual defendants in this case are entitled to qualified immunity because the alleged FHA violation was not a violation of clearly established law. Of course, the fact that defendants are entitled to qualified immunity does not mean that the governmental entity will escape accountability for its failure to accommodate, should the facts be as plaintiff alleges. But the Court cannot say that a reasonable official would have been on notice, under the facts of this case, that the law required the City to approve a permit which increased the allowed occupancy from eight to ten residents.

The complaint at first blush also appears to set out a claim of FHA discrimination on the basis of familial status. On closer examination, however, the complaint appears to actually assert that if the potential residents were related, they would be allowed to live in the home. If Keys could show that it has parental-type custody of the residents, the FHA family status provision might be implicated. Even if so, the law on this point is not clearly established and thus defendants are entitled to qualified immunity on any such claim.

B. *Federal Constitutional Claims*[6]

Defendants' motion to dismiss does not squarely address the equal protection, due

---

6. The FHA grants standing to third parties. *See Housing Auth. of Kaw Tribe v. Ponca City*, 952 F.2d 1183, 1193 (10th Cir.1991). The record is less clear whether Keys has standing to assert the *constitutional* rights of potential residents. The Court is inclined to find that based on the relationship which the complaint alleges between Keys and potential residents, third-party standing might exist. *See Terrell v. I.N.S.*, 157 F.3d 806 (10th Cir.1998) ("Third-party standing requires not only an injury in fact and a close relation to the third party, but also a hindrance or inability of the

third party to pursue his or her own claims."). This question remains for later determination, based on proven facts. But on the face of the complaint the Court finds that plaintiff arguably has standing to raise these claims on behalf of potential residents. *See Singleton v. Wulff*, 428 U.S. 106, 115, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) (relationship between litigant and third party must render litigant as effective a proponent of the right as third party would have been). The Court also notes that plaintiff's claim of third-party

process or taking claims. It asserts qualified immunity, however, as to the entire case. Therefore the Court will determine whether defendants are entitled to qualified immunity on those claims. *See Tonkovich*, 159 F.3d at 528 (defendants' motions to dismiss generalized due process claim on basis of qualified immunity were sufficient to put district court on notice that they were asserting qualified immunity with respect to plaintiff's entire due process claim, including substantive due process).

### 1. *Substantive Due Process*

■ Although plaintiff has failed to set forth its substantive due process claim with any specificity, the qualified immunity motion is easily sustained. "The standard for judging a substantive due process claim is whether the challenged government action would 'shock the conscience of federal judges.'" *Uhlrig v. Harder*, 64 F.3d 567, 573 (10th Cir.1995) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 126, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992) (further quotation omitted)). To satisfy this standard, "a plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power"; rather, a plaintiff "must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." *Id.* Plaintiff has cited no law, and the Court has found none, that would support a finding that defendants' actions in declining plaintiff's application for a special use permit was "shocking to the conscience." Defendants are therefore entitled to qualified immunity on plaintiff's substantive due process claim

standing might be self-defeating under § 1983, which does not allow one to recover for violations of the rights of a third party. It is a "well-settled principle that a section 1983 claim must be based upon the violation of plaintiff's personal rights, and not the rights of someone else." *Archuleta v. McShan*, 897 F.2d 495, 497 (10th Cir.1990); *cf. Trujillo v.*

### 2. *Equal Protection*

The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws," which is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Keys asserts that defendants' decision to deny a special use permit discriminated against potential group home residents on the basis of handicap. The Supreme Court has stated that handicapped persons are not a "suspect" class, however, and therefore allegedly discriminatory policies are analyzed under the "rational relationship test." *See City of Cleburne*, 473 U.S. at 448–49, 105 S.Ct. 3249. Keys could show discrimination under the rational basis test if it showed that the permit was denied because of unsubstantiated fears or irrational prejudices. *See Bangerter*, 46 F.3d at 1503 n. 20. At the pleading stage such an assertion could not be conclusively determined.

■ But plaintiff's equal protection claim has a more fundamental problem. Keys does not allege that defendants have issued special use permits for more than eight residents to other group homes. Thus it has failed to allege that defendants have treated it differently than group homes for non-handicapped persons. *See generally Lyng v. Castillo*, 477 U.S. 635, 638–39, 106 S.Ct. 2727, 91 L.Ed.2d 527 (1986). Because Keys has failed to allege a violation of equal protection, defendants are entitled to qualified immunity on this claim.

*Board of County Commr's*, 768 F.2d 1186 (10th Cir.1985) (mother and sister of a county jail inmate had standing to assert claims under § 1983 for deprivations of their own rights of familial association based on alleged wrongful death of their son and brother while incarcerated).

### 3. Due Process Taking[7]

■ Many intangible rights are protected under procedural due process, "although their infringement falls short of an exercise of the power of eminent domain for which just compensation is required under the Fifth and Fourteenth Amendments." *Landmark Land Co. of Oklahoma, Inc. v. Buchanan,* 874 F.2d 717, 723 (10th Cir.1989) (citing *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) (property interest in continued public employment where discharge for cause only); *Atkins v. Parker,* 472 U.S. 115, 105 S.Ct. 2520, 86 L.Ed.2d 81 (1985) (property interest in continued receipt of food stamps); *Keney v. Derbyshire,* 718 F.2d 352 (10th Cir.1983) (property interest in license to practice medicine)).

■ Whether Keys has a property interest in the special use permits depends on "existing rules or on understandings that stem from an independent source, such as state law." *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Keys has a property interest in the special use permit only to the extent that Kansas law or local ordinances give it a "legitimate claim of entitlement" to the permit as opposed to a mere "unilateral expectation." *Id.* Here, Keys cannot show a claim of entitlement to a permit for two persons over the number provided by state law and the local ordinance governing group homes. Thus the Court need not decide whether Keys adequately alleges a violation of procedural due process—the "opportunity to be heard at a meaningful time and in a meaningful manner." *Eldridge,*

424 U.S. at 333, 96 S.Ct. 893. Defendants are entitled to qualified immunity on this claim.

### III. State Law Claims

■ Finally, defendants assert that they are entitled to qualified immunity on Keys' claim that defendants violated K.S.A. § 12–736. As noted above, Section 736 provides that "persons with a disability shall not be excluded from the benefits of single family residential surroundings by any municipal zoning ordinance." Defendants assert that it is not clear that potential residents will be "disabled" under the statute, but as set forth above with respect to the FHA claim, the complaint asserts that the residents will be mentally disabled. Defendants correctly point out, however, that on its face K.S.A. § 12–736 limits a group home to eight or fewer persons with a disability. The facts alleged by Keys would not support a finding that defendants clearly violated established law as set forth in the statute. The individual defendants are thus entitled to qualified immunity on this claim.

**IT IS THEREFORE ORDERED** that the *Motion to Dismiss of Defendants Campbell, Bacon, Trout, and Copeland* (Doc. # 13) filed October 6, 1998, is **OVERRULED** as to defendants' claims of absolute legislative immunity and **SUSTAINED** as to defendants' claims of qualified immunity. All claims against these four individual defendants are **DISMISSED.**

---

**7.** Keys appears to contend that denial of the special use permit constitutes a taking of property without just compensation in violation of the Fifth Amendment. To decide whether a Fifth Amendment taking has occurred, a court must consider "the economic impact of the challenged action and the extent to which it interferes with reasonable investment-backed expectations." *ACORN v. City of Tulsa, Oklahoma,* 835 F.2d 735 (10th Cir. 1987). Here, plaintiff has not alleged that the denial of a special use permit would lower the property's value in any respect. Thus Keys has not pled a factual basis for a Fifth Amendment taking claim. *See Loveladies Harbor, Inc. v. United States,* 28 F.3d 1171, 1179 (Fed. Cir.1994) (taking claim requires, among other elements, "a denial of economically viable use of the property as a result of the permit denial").